# COOPER ERVING

ATTORNEYS AT LAW · ESTABLISHED 1785

**coopererving.com**

MICHAEL A. KORNSTEIN
SUSAN CARROLL PICOTTE
PHILLIP G. STECK
KELLY L. MALLOY POGODA
DAVID C. ROWLEY
CARLO A.C. DE OLIVEIRA ±

DENNIS W. HABEL
CAROLINE W. T. LANG
BRETT D. FRENCH ±
COLIN D. DWYER
BRIAN D. DEINHART

*ALSO ADMITTED IN VERMONT
±ALSO ADMITTED IN MASSACHUSETTS

COOPER ERVING & SAVAGE LLP
39 NORTH PEARL STREET
ALBANY, NEW YORK 12207-2797
(518) 449-3900
FACSIMILE (518) 432-3111

CLIFTON PARK OFFICE
1520 CRESCENT ROAD – SUITE 400
CLIFTON PARK, NEW YORK 12065
(518) 371-0716

SARATOGA SPRINGS OFFICE
63 PUTNAM STREET
SARATOGA SPRINGS, NEW YORK 12866
(518) 244-8918

JAMES FENIMORE COOPER
(1888-1938)
WM. VAN RENSSELAER ERVING
(1925-1940)
B. JERMAIN SAVAGE
(1910-1952)

SENIOR COUNSEL
TERRANCE P. CHRISTENSON

OF COUNSEL
CHRISTOPHER P. FLINT*
PAUL F. DWYER
DAVID R. GREEN

REPLY TO ALBANY OFFICE
PSTECK@COOPERERVING.COM
DIRECT DIAL: (518) 432-3178

July 30, 2019

By ECF

Honorable P. Kevin Castel
United States District Judge
United States District Court for the Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007-1312

    Re:    *Steck v. DiNapoli*, et al., 19-cv-05015 (PKC)

Dear Judge Castel:

This letter responds to defendants' pre-motion letter dated July 25, 2019. Plaintiffs submit this letter in response and attach a copy of their complaint for the convenience of the Court.

Introduction

This case challenges the validity under the United States Constitution of the Outside Income rules adopted by the New York State Committee on Legislative and Executive Compensation. The Committee banned lawyers, businessmen, pharmacists, and others from continuing to work in their business if they wanted to continue serving as or become New York State Legislators. This would create a class of professional legislators and exclude numerous citizens from service as described in the Complaint ¶¶ 50k, 51, and 52.

Pre-motion letter
July 25, 2019
Page 2

Stay or Adjournment of the proceedings

Dismissal of this proceeding is inappropriate. The Attorney General has sought to appeal the ruling of New York State Supreme Court Justice Ryba holding that the Committee acted *ultra vires*, that is outside the powers delegated to it by the Legislature. It was empowered to determine legislative salary and nothing more. The Attorney General, by appealing, has expressed its belief that Justice Ryba's decision is incorrect. Therefore, it cannot rely on her decision to gain dismissal of this case.

On the other hand, plaintiffs would consent to an adjournment or stay of the proceedings for a period of three months. Defendants allege in their letter that they have filed a notice of appeal of the State court decision invalidating the outside income rules. However, under New York law, that act merely preserves one's right to appeal. It does not mean an appeal will be perfected. After the three month period, defendants should report whether or not they intend to perfect their appeal. If they are irreversibly committed to perfecting their appeal, they should say so now, so that an appropriate schedule for this litigation could be set.

If the State court judgment invalidating the ban on outside income were unexpectedly reversed, plaintiffs would be in the very difficult position of having to request a stay of the State statute by order to show cause, which might well have very limited duration, and then proceeding to immediately file a motion for preliminary injunction. This process needs to be taken into account in a scheduling order if defendants are in fact appealing Judge Ryba's ruling.

There is, however, one part of this case will not be moot even if there is no appeal of the State court decision adverse to defendants. ¶¶ 94 and 95 of the Complaint allege that tying legislative pay to passage of an on-time budget violates the First Amendment. This is a rule that was in effect at the time plaintiffs entered the New York State Assembly. Legislative Law § 5(1) ("if legislative passage of the budget as defined in subdivision three of this section has not occurred prior to the first day of any fiscal year, the net amount of any such bi-weekly salary installment payments to be paid on or after such day shall be withheld and not paid until such legislative passage of the budget has occurred").

Plaintiffs will need to amend the factual portion of their complaint and Count I to make perfectly clear that this challenge applies to current New York State law as well as to the legislation enacted by the Commission, although that is stated in the "Wherefore" clause of the Complaint, ¶ F.

Colorado River Abstention Doctrine

Prior to addressing the *Colorado River* abstention doctrine, plaintiff points out that the United States Supreme Court recently held that there are no State procedural prerequisites to asserting a § 1983 claim. *Knick v. Township of Scott*, 2019 U.S. LEXIS 4197 (Supreme Court, June 21, 2019). The present case involves entirely different parties and entirely different issues than the State court litigation relied on by defendants. Plaintiffs are asserting a violation of their Federal constitutional rights. Therefore, the State court litigation does not impact this case

Pre-motion letter
July 25, 2019
Page 3

unless the State court judgment invalidating the Outside Income restrictions is upheld on appeal, which would leave this court with only the issue of linking legislative pay to an on-time budget to decide.

The Attorney General, in relying on the *Colorado River* abstention doctrine, raises the spectre of piecemeal litigation. The general rules of law relating to *Colorado River* abstention are well-established and rebut the allegations of the Attorney General:

• There is a heavy presumption in favor of jurisdiction in the federal courts. *Bethlehem Contracting Co. v. Lehrer/McGovern, Inc.*, 800 F.2d 325, 327 (2d Cir. 1986); *Cadle Co. v. Cohen*, 1999 U.S. App. LEXIS 5210 *4 (2d Cir. 1999) (citing *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 16 (1983); *AM Broadband, LLC v. First Fin. Ins. Co.*, 2009 U.S. Dist. LEXIS 9677 * 14 (D.Conn. 2009).

• There is no bar to parallel Federal and State proceedings. Ordinary principles of *res judicata* and collateral estoppel are typically sufficient to prevent inconsistent determinations in the Courts. *Woodford v. Cmty. Action Agency of Greene County*, 239 F.3d 517, 522 (2d Cir. 2001); *Gregory v. Daly*, 243 F.3d 687, 702 fn. 13 (2d Cir. 2001); *Fischmann v. VisionTel*, 934 F. Supp. 115, 118 (S.D.N.Y. 1996).

• Abstention is appropriate only in exceptional and rare circumstances. *Royal & Sun Alliance Ins. Co. of Can. v. Century Int'l Arms, Inc.*, 466 F.3d 88, 94 (2d Cir. 2006); *Cadle Co. v. Cohen*, 1999 U.S. App. LEXIS 5210 *6 (2d Cir. 1999); *Bethlehem Contracting Co. v. Lehrer/McGovern, Inc.*, 800 F.2d 325, 328 (2d Cir. 1986).

• It is not incumbent on the plaintiffs to demonstrate why jurisdiction should be exercised; defendants must establish exceptional circumstances. *Village of Westfield v. Welch's*, 170 F.3d 116, 122 (2d Cir. 1999).

• There must be some strong countervailing policy reason against jurisdiction to establish exceptional circumstances. *FDIC v. Four Star Holding Co.*, 178 F.3d 97, 101 (2d Cir. N.Y. 1999); *Abercrombie v. College*, 438 F. Supp. 2d 243, 258 (S.D.N.Y. 2006).

None of these criteria are met here. The parties and issues are different in the State and Federal actions. Judge Ryba resolved the case based on principles of State law not on factfinding, thus any professed concern about possible collateral estoppel effect is misplaced. The State actions concern (1) the ability of the Legislature to delegate law-making to a Committee of this sort and (2) whether the Committee even had the authority to address outside income under the particular delegation made to it by the Legislature. Here, the issue is, assuming appropriate delegation, whether or not the Committee's lawmaking contravened the United States Constitution. That is an ordinary function for a Federal Court to decide which has not been raised in the State proceedings – to determine if a State law violates the United States Constitution.

Pre-motion letter
July 25, 2019
Page 4

Qualified Immunity

Qualified immunity is not a bar to this action against the individual defendants. Qualified immunity is an affirmative defense. Nevertheless, defendants argue without basis that plaintiffs should plead against qualified immunity. The Second Circuit stated on the contrary: "Qualified immunity, an affirmative defense on which the defendant officials bear the burden of proof [citations omitted], 'protects public officials performing discretionary functions from personal liability in a civil suit for damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known,'" *Vincent v. Yelich*, 718 F.3d 157, 166 (2d Cir. 2013).

Defendants have made no allegations that they should not have been well aware of the legal principles that form the basis for the complaint. Plaintiff of course has a duty of candor to the Court. Plaintiff's cause of action for violation of the republican form of government clause is novel and arguably could not have been expected by defendants. That clause was held to be non-justiciable in an opinion by then Chief Justice Taney the author of the Dred Scott decision. However, plaintiffs believe that recent comments by the United States Supreme Court indicate that the republican form of government clause is not devoid of meaning. *See* discussion of the republican form of government clause *infra*.

First Amendment

Plaintiffs' First Amendment analysis demonstrates that under the logic of the *Citizens United* decision, the Pay Committee cannot in effect force businessmen, lawyers, and others to give up their incomes to serve in the State Legislature. *Citizens United* says that requirements of this kind are a subterfuge for limiting the content of speech, since different occupations necessarily carry with them different perspectives on politics and legislation.

Defendants' letter does not contain any analysis of the First Amendment other than to say that *Citizens United* was decided on very different facts than this case. However, plaintiffs' complaint quotes at length the First Amendment analysis in *Citizens United* upon which plaintiffs rely and why it applies here. Defendants have done nothing to explain why that logic is faulty. Plaintiffs therefore rely on the complaint, without the need of amending same.

Equal protection

Defendants' letter asserts that rational basis review is applicable to plaintiffs' equal protection claim. Defendants are incorrect. Their letter ignores the fact that classifications that implicate First Amendment free speech considerations are subjected to strict scrutiny. Therefore, these classifications are treated no differently than the "suspect classifications" that defendants assert are lacking in this case. *Phillips v. City of Dallas*, 781 F.3d 772, 778-779 (5th Cir. 2015) (speech may nonetheless be subjected to limitation if the Government interest is compelling); *MacKenzie v. Snow*, 675 F.Supp. 1333, 1339, 1341 (N.D.Ga. 1987) (applying compelling state interest test, noting that all First Amendment challenges may be transformed into equal

Pre-motion letter
July 25, 2019
Page 5

protection challenges just by focusing on the classification embodied in the legislative scheme, and applying the compelling state interest test under the equal protection clause as well).

There is no need to amend the complaint. It adequately pleads the correct equal protection analysis.

Unconstitutional Conditions

The doctrine of unconstitutional conditions holds simply that "the government may not place a condition on the receipt of a benefit or subsidy that infringes upon the recipient's constitutionally protected rights, even if the government has no obligation to offer the benefit in the first instance." *Alliance for Open Socy. Intl., Inc. v. United States Agency for Intl. Dev.*, 651 F.3d 218, 231 (2d Cir 2011). Plaintiffs receive compensation for holding an elected office that is a benefit granted to Plaintiffs by the New York State government. The laws that Plaintiffs now challenge condition Plaintiffs' receipt of this benefit on the performance of certain actions, which Plaintiffs may not be constitutionally permitted to undertake.

First, Plaintiffs have property interests in their or their spouses law practices and attorney's licenses. Pursuant to the outside income ban, Plaintiffs would be required to give up their law practices along with any meaningful use of their law license – their property – in order to obtain income from their legislative office.

Similarly, the law conditioning payment of a legislator's salary on passage of timely budget, may compel the legislator to vote affirmatively on a budget proposal in order to receive compensation. Thus, his or her salary benefit would be conditioned on compelled speech. Both of these allegations detail core cases of the unconstitutional limitations doctrine. Plaintiffs are being forced to forgo their constitutional rights to their property and freedom of speech and conscience to obtain a government benefit.

Thus, Plaintiff's claim should not be dismissed. Nor is amendment of the complaint necessary.

Due Process

Defendants point out that plaintiffs who are Assemblymembers voted for the Pay Committee. They neglect to point out that nothing in the relevant statute authorized the Committee to address "Outside Income." Without that authorization, there can be no notice in the sense of notice and an opportunity to be heard.

Furthermore, defendants appear to have little understanding of the legislative process. The mere fact that the Assembly and Senate could have met to override the Pay Committee ignores the fact that this would have required a special session of the legislature, and none of the plaintiffs had the power to convene a special session.

Pre-motion letter
July 25, 2019
Page 6

Wholly apart from the question being litigated in State Court as to whether the Committee had legislative authority to consider Outside Income limitations, plaintiffs in this action contend that, once the Committee decided in secret to limit Outside Income, it could not issue its decision by surprise without giving notice of its proposed rules and inviting comment. That would not be required if the Committee were legislating solely to bind future legislatures. But instead the Committee purported to strip a specific class of legislators of their Outside Income mid-term. Since a specific group was targeted, those earning outside income, notice and an opportunity to be heard had to be given on the proposed rule, not just, as defendants contend, on the meetings of the Committee in general. Defendants focus only on the fact that the Committee gave notice of its meetings. That is not sufficient when a particular class is targeted. *Wheeler v. Cohen*, 2015 U.S. Dist LEXIS *9-10 (D.Vt. 2015) ("a due process claim is available . . . with legislation targeted at a particular individual or small group of individuals."). Nor was there any basis for plaintiffs to suspect that outside income would be addressed, as it was not referenced in the enabling legislation setting forth the tasks that the Committee was to perform.

There is no need to amend the complaint to address the procedural due process issue. The appropriate analysis is already pleaded.

Contracts Clause

Historically legislative salaries were low because members were allowed outside income. The Pay Committee acknowledged that a substantial increase in the pay of legislators was long overdue. Indeed, according to the Committee, "the $79,500 base salary for lawmakers now has a purchasing power of $51,401 over 1998 when it was enacted." Report, p. 11. The Committee, in addition to raising legislative pay, indicated that it was transforming the legislature into a full-time body, which it was not historically, *id.* at 10, and that it had the power to regulate even compensation not paid by the State, p. 18. The Committee argued in its report that outside income and State salary were inextricably intertwined but now inconsistently comes before this Court and says that its actions against outside income should be looked at separately from legislative salary.

Thus, the provisions of the New York State constitution setting the two-year term and preventing reduction in pay, by the very logic of the Pay Committee itself, prevent lowering legislative compensation during the current term. The Pay Committee could have avoided a challenge under the contracts clause if it had adopted rules that apply only after the current legislative term expired. But it did not do so. The changes take place mid-term.

Since additional facts need to be pleaded in the complaint in further support of plaintiffs' position on this issue, plaintiff seeks to amend the complaint accordingly.

Republican Form of Government

Plaintiffs' complaint argues that allowing unelected commissions to make laws, as opposed to recommendations, can under circumstances violate the clause in the United States Constitution mandating that the States have a republican form of government. Defendants are

Pre-motion letter
July 25, 2019
Page 7

correct that the republican form of government or guarantee clause was held to be non-justiciable in a decision written by the ardent pro-slavery advocate Chief Justice Roger Taney. *Luther v. Borden*, 48 U.S. 11 (1849).

Commentators have long disagreed. See *The Guarantee Clause*, by Ryan C. Williams, 132 Harvard Law Review 602 (2018); *Death By a Thousand Cuts: The Guarantee Clause Regulation of State Constitutions*, by Jacob M. Heller, 62 Stanford Law Review 1711 (2010); *Redeeming the Welshed Guarantee: A Scheme for Achieving Justiciability*, by Ethan Leib, 24 Fordham Law Review 143 (2002); *Cases Under The Guarantee Clause Should Be Justiciable*, by Erwin Chemerinsky, 65 University of Colorado Law Review 849 (1994); *American Constitutional Law*, 2d Edition, by Laurence H. Tribe, at page 398, (1988); *The Guarantee Clause and State Autonomy: Federalism for a Third Century*, by Deborah J. Merritt, 88 Columbia Law Review 1 (1988); *The Guarantee of Republican Government: Proposals for Judicial Review*, by Thomas C. Berg, 54 University of Chicago Law Review 208 (1987); *Democracy and Distrust: A Theory of Judicial Review*, by John H. Ely, at Pages 118 to 123 (1980); *The Guarantee Clause of the U.S. Constitution*, by William Wiecek, at pages 287 to 300 (1972); *The Guarantee Clause of Article IV, Section 4: A Study in Constitutional Desuetude*, by Arthur Bonfield, 46 Minnesota Law Review 513 (1962).

Recently, the modern Supreme Court of the United States has repeatedly questioned the wisdom of the Taney decision. In *New York v. United States*, 505 U.S. 144 (1992), Justice Sandra Day O'Connor, writing for the majority, strongly asserted that the Court may indeed view claims, brought under Article IV, section 4's guarantee of a republican form of government, as justiciable. "The view that the Guarantee Clause implicates only nonjusticiable political questions has its origin in *Luther* v. *Borden*, 7 How. 1 (1849) … This view has not always been accepted. . . . Contemporary commentators have likewise suggested that courts should address the merits of such claims, at least in some circumstances." Id. at 184-185. *Accord, Arizona State Legislature v. Arizona Independent Redistricting Commission*, 135 S.Ct. 2652, 2660 fn. 3 (2015) (Ginsburg, J.) (citing Justice O'Connor's view) and 135 S.Ct. at 2687 (Roberts, J., dissenting) ("It cannot be presumed that any clause in the constitution is intended to be without effect; and therefore such a construction is inadmissible."); *Reynolds* v. *Sims*, 377 U. S. 533, 582 (1964) (only "some questions raised under the Guaranty Clause are nonjusticiable").

Plaintiffs believe the time is right to squarely address the justiciability of the republican form of government clause. Counsel for plaintiffs is fulfilling its duty to advocate in good faith for a change in the law on this issue. So there is no need to amend this portion of the complaint.

In sum, amendment of the complaint is needed only with respect to Count V, the impairment of contracts claim, and to clarify that plaintiffs challenge not only the Pay Committee's linkage of salary increases to passage of an on-time budget but also the provision of New York State law which, prior to the Committee's ruling, precluded legislators from receiving salary if they did not pass on on-time budget until such time as a budget was passed.

Thank you for your consideration.

Pre-motion letter
July 25, 2019
Page 8

Very truly yours,

COOPER ERVING & SAVAGE LLP

Phillip G. Steck

Enclosure

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PHILLIP G. STECK, THOMAS J. ABINANTI, JOHN T.
MCDONALD III, PATRICIA K. STECK, JANET LONGO-
ABINANTI, AND JOSEPH E. O'BRIEN,

                                         Plaintiffs,

            - against –

THOMAS P. DINAPOLI, H. CARL MCCALL, SCOTT
STRINGER, WILLIAM C. THOMPSON, JR., and THE
STATE OF NEW YORK,

                                         Defendants.

**COMPLAINT**

Civil Action No.

The plaintiffs, Phillip G. Steck, Thomas J. Abinanti, John T. McDonald III, Patricia K.

Steck, Janet Longo-Abinanti, and Joseph E. O'Brien, by their attorneys, Cooper Erving & Savage

LLP, respectfully allege as follows:

**INTRODUCTION AND JURISDICTIONAL STATEMENT**

1.      This is a civil rights action brought pursuant to 42 U.S.C. § 1983 and the principles of

constitutional law first enunciated in *Ex parte Young*, 209 U.S. 123 (1908), to redress violations

of plaintiff's rights under Article 1, section 10, clause 1, Article IV, section 4, and the First, Fifth,

and Fourteenth Amendments to the United States Constitution.

2.      Plaintiffs challenge the unique "outside income" rules adopted by the New York State

Committee on Legislative and Executive Compensation, an appointed and not elected body, as

violating the aforementioned constitutional provisions.

3.      No other State in the nation has remotely similar "outside income" rules.   Indeed, the

National Conference of State Legislators advised that such rules do not exist at all in any other

state.

4.    Defendants, their agents and employees have, under the color of state law, subjected plaintiffs to an unlawful interference with plaintiffs' peaceful exercise of their constitutionally protected speech, have denied them equal protection of the law by favoring certain forms of "outside income" as compared to others, violated plaintiffs' right to due process of law, violated their right to be free from the impairment of contracts entered into between the legislator plaintiffs and the State of New York (Article 1, section 10, clause 1), and contravened the constitutional requirement that each state have a republican form of government (Article IV, section 4).  Property herein refers variously to the plaintiff legislators' rights as elected officials not to have their State-guaranteed compensation or benefits reduced in the middle of their term of office and/or not to have the value of their law practice or law license or pharmacy license or pharmacy business taken from them or their respective spouses.

5.    Declaratory and injunctive relief is sought against the State of New York because the violations of the First and Fourteenth Amendments are ongoing *ad infinitum* and apply to all 150 members of the New York State Assembly, all 63 members of the New York State Senate, and all persons who may choose to run for New York State legislative office in the future.  A significant number of the members of the Legislature are practicing attorneys in addition to plaintiffs.  Others are in a variety of professions from which they earn outside income such as pharmacists, funeral directors, occupational therapists, insurance agents, farmers, business managers, etc.

6.    The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343 (civil rights jurisdiction).

7.    Venue is properly laid in the Southern District of New York, under the provisions of 28 U.S.C. § 1391, in that all, or a substantial part, of the events or omissions giving rise to the

claims alleged herein occurred within this District, or are located in this District, at least one or more of the defendants reside within this District, and all defendants have offices in this District.

## PARTIES

8.     At all times relevant to the complaint, plaintiff, Phillip G. Steck, was and still is a resident of the Town of Colonie, County of Albany, State of New York, and a citizen of the United States.

9.     At all times relevant to the complaint, plaintiff Thomas J. Abinanti was and still is a resident of the Town of Mount Pleasant, County of Westchester, State of New York, and is a citizen of the United States.

10.     At all times relevant to the complaint, plaintiff John T. McDonald III was and still is a resident of the City of Cohoes, County of Albany, State of New York, and is a citizen of the United States.

11.     At all times relevant to the complaint, plaintiff Patricia K. Steck was and still is the spouse of Phillip G. Steck and shares the same residence as him.

12.     At all times relevant to the complaint, plaintiff Janet Longo-Abinanti was and still is the spouse of Thomas J. Abinanti and shares the same residence as him.

13.     At all times relevant to the complaint, plaintiff Joseph E. O'Brien was and still is a resident of the Town of Colonie, County of Albany, State of New York.

14.     In November, 2018, plaintiff Steck was re-elected to his fourth two-year term in the New York State Assembly.  He represents the residents of Colonie, Niskayuna, and the City of Schenectady.

15.     Plaintiff Abinanti was first elected to the New York State Assembly in 2010. In November, 2018, Abinanti was re-elected to his fifth two-year term in the New York State Assembly. He represents the residents of the towns of Greenburgh and Mount Pleasant.

16.     In November 2018, Plaintiff McDonald was re-elected to his fourth two-year term in the New York State Assembly. He is the former Mayor of Cohoes, New York, and represents that city as well as the cities of Watervliet and Rensselaer, portions of the cities of Troy and Albany, and the towns of Waterford, North Greenbush, and Green Island.

17.     At all times relevant to the complaint, defendant Thomas P. DiNapoli was Comptroller of the State of New York and a member of the Committee on Legislative and Executive Compensation. He is sued in his personal capacity. Defendant DiNapoli has an office in the Southern District of New York.

18.     At all times relevant to the complaint, defendant H. Carl McCall was Chair of the Committee on Legislative and Executive Compensation. He is a former State Senator, a former New York State Comptroller, a former member of the Board of the New York Stock Exchange, and a member of the SUNY Board of Trustees, as well as a member of various corporate boards. Mr. McCall is sued in his personal capacity. Defendant McCall resides in and/or has an office in the Southern District of New York.

19.     At all times relevant to the complaint, defendant Scott Stringer was the Comptroller of the City of New York and a member of the Committee on Legislative and Executive Compensation. Mr. Stringer is sued in his personal capacity. Defendant Stringer resides in and/or has an office in the Southern District of New York.

20.     At all times relevant to the complaint, defendant William C. Thompson, Jr. was a former Comptroller of the City of New York and a member of the Committee on Legislative and

Executive Compensation. Mr. Thompson is sued in his personal capacity. Defendant Thompson resides in and/or has an office in the Southern District of New York.

21.    The claims against the State of New York are limited to declaratory, injunctive relief, and attorneys' fees.

22.    The claims against the individuals are for declaratory, injunctive, and damages relief, and attorneys' fees.

## FACTUAL ALLEGATIONS

23.    Sheldon Silver served as Speaker of the New York State Assembly from 1994 until 2015. During his tenure, he amassed tremendous political power and was able to use his position as Speaker to leverage "outside income" from work, sometimes ostensibly legal work, that he did not personally perform and which he hid from the public. As a result, he was convicted of crimes under federal law and sentenced to prison.

24.    Following Silver's conviction, New York State enacted comprehensive requirements for the disclosure of all outside income of legislators. Plaintiff Steck, for example, has in the last three years filed spreadsheets disclosing all legal fees over $5,000 which were based on his own legal work or legal work of any attorney in his law firm, Cooper Erving & Savage, LLP, to whom he referred legal work. Clients, amounts paid for services on behalf of those clients, and the nature of the matter are publicly disclosed. Any member of the public can readily ascertain whether that legal work actually conflicts with plaintiff's duties as a member of the State Assembly. No such conflict has been identified. Plaintiffs do not deny that a potential conflict may occasionally arise which would require an attorney to avoid the representation, and the plaintiffs who are attorneys do that. Lawyers in private practice who are not legislators often face a variety of potential conflicts of interest that require them to avoid the representation.

Evaluating whether a conflict of interest may preclude representation of a particular client is a routine everyday part of law practice.

25.    No issues regarding outside income have arisen since the full disclosure legislation went into effect.

26.    Meanwhile, there was corruption in the Executive Branch of New York State government.    Joseph Percoco, the current Governor's former campaign manager, deputy executive secretary, and longtime confidant was convicted under federal law of using his government position to leverage outside income for himself and his wife, and he was sentenced to prison.

27.    Other examples may be cited from the Executive Branch of so-called "outside income." The Governor of the State of New York in 2017 benefitted from lawful outside income.  He received $738,000 for a memoir that sold only 3,200 copies.  The publisher of the book is a subsidiary of News Corporation.  Moreover, his Commissioner of Health in 2018 failed to disclose "outside income" of $61,000 per year he earned on top of his salary.

28.    A Comptroller of the State of New York, an independently elected executive, was convicted of corruption and sentenced to prison.

29.    Plaintiffs do not deny that at the very pinnacles of power in New York State unscrupulous persons have sought to purchase influence.  That is actually far less likely in the case of rank and file legislators who have to work with many other members in order to pass legislation.

30.    In 2019, the State Legislature will be in session 58 days during the first six months of the year.  On non-session days, legislators work on bills, seek co-sponsorship of other bills, engage in constituent correspondence, and constituent advocacy.  They also meet with constituents and

attend events in their respective districts.  However, when the Legislature is not in session for the remaining six months of the year, the opportunity to earn outside income surely exists.

31.     In comparison, during the period 2001 through 2016, the United States House of Representatives averaged over 130 session days.

32.     The members of the State Legislature had received the same base pay of $79,500 since 1998. The Legislators do not receive any pay if a budget is past due until such time as a budget is passed.  This is a law the Legislature itself adopted.

33.     In the 2018 legislative session, after past attempts at a similar approach failed, the Legislature created the Committee on Legislative and Executive Compensation to evaluate whether legislators and high-level executive employees were entitled to a pay increase and in what amount.  The Committee's "recommendations" were to have force of law if adopted by a certain deadline prior to the commencement of the 2019 legislative session, which deadline was met.

34.     The Committee was tasked in the New York State budget, Part HHH of Chapter 59 of the Laws of 2018, with the following:

> § 2. 1. In accordance with the provisions of this act, the committee shall examine the prevailing adequacy of pay levels, allowances pursuant to section 5-a of the legislative law, and other non-salary benefits, for members of the legislature, statewide elected officials, and those state officers referred to in section 169 of the executive law.
>
> 2. The committee shall determine whether, on January 1, 2019, the annual salary and allowances of members of the legislature, statewide

elected officials, and salaries of state officers referred to in section 169 of the executive law, warrant an increase.

3. In discharging its responsibilities under subdivision two of this section, the committee shall take into account all appropriate factors including, but not limited to: the parties' performance and timely fulfillment of their statutory and Constitutional responsibilities; the overall economic climate; rates of inflation; changes in public-sector spending; the levels of compensation and non-salary benefits received by executive branch officials and legislators of other states and of the federal government; the levels of compensation and non-salary benefits received by comparable professionals in government, academia and private and nonprofit enterprise; the ability to attract talent in competition with comparable private sector positions; and the state's ability to fund increases in compensation and non-salary benefits.

35.    The Committee's enabling legislation nowhere mentions the phrase "outside income." A limitation on "outside income" is a matter of pure government policy unconnected to the budget. New York State law prohibits the inclusion of pure policy matters in the budget.

36.    Some newspapers, lobbying organizations, and the Governor had advocated a limit on "outside income" for some time.

37.    Apparently influenced by the agitation of those referred to in ¶ 36, the Committee determined that it had the authority to limit "outside income" but imposed "outside income" limitations only on legislators. No "outside income" limitations were imposed on the members

of the executive branch over which the Committee also had authority, notwithstanding the examples of corruption in the executive branch cited earlier.

38.     The Legislature never adopted the Committee's recommendations nor ever gave a clear delegation to the Committee to restrict "outside income."

39.     The Committee imposed the following outside income limitations:

> New York shall limit receipt of outside earned income to eliminate both the perception of and any actual conflicts of interest amongst the membership of the two houses and shall completely eliminate outside earned income where there is a fiduciary relationship including service on a board of a company whether for-profit or not-for-profit, to serve as an attorney, financial advisor, consultant or in any other capacity where the public could question whether the employer or the citizens of this state are being properly served. In all cases, where employment is not prohibited, a hard cap of 15% of legislative base salary shall be imposed on outside earned income to ensure that the primary source of earned income is from the state.  Specifically, the prohibited activities are:
>
> • receiving compensation for affiliating with or being employed by a firm, partnership, association, corporation, or other entity that provides professional  services involving a  fiduciary  relationship, except for the practice of medicine;
>
> • permitting their name to be used by such a firm, partnership, association, corporation, or other entity;

- receiving compensation for practicing a profession that involves a fiduciary relationship except for the practice of medicine;

- receiving compensation as an officer or member of the board of an association, corporation or other entity;

- receiving compensation for teaching, without prior notification to and approval from the legislative ethics commission;

- receiving advance payments on copyright royalties, fees, and their functional equivalents.

The limitation on outside earned income shall be $18,000.

Outside earned income shall mean wages, salaries, fees, and other forms of compensation for services actually rendered. It shall not include any: (1) salary, benefits, and allowances paid by New York state;

(2) income attributable to service with the military reserves or national guard;

(3) income from pensions and other continuing benefits attributable to previous employment or services;

(4) income from investment activities, where the member's services are not a material factor in the production of income

(5) income from a trade or business in which the member or their family holds a controlling interest, where the member's services are not a material factor in the production of income;

6) copyright royalties, fees, and their functional equivalent, from the use or sale of copyright, patent and similar forms of intellectual property

rights, when received from established users or purchasers of those rights;
and

(7) compensation for services actually rendered prior to January first, two
thousand twenty, or prior to being sworn in as a member of the legislature.

40.    Outside income would be limited to 15% of legislative income, though outside income
for lawyers was entirely barred.

41.    Legislative salaries are not at issue in this action.   For background purposes, the
Committee also raised legislative salaries as follows:  $110,000 in 2019, $120,000 in 2020, and
$130,000 in 2021.   Thus, the amount of "outside income" a non-lawyer could earn would
increase through 2021 because 15% was calculated on top of those salaries.

42.    But, to repeat, real practicing lawyers are banned from "outside income" entirely,
ostensibly because of one lawyer Sheldon Silver's misdeeds, though he did not represent any
clients in the course of unlawfully obtaining "outside income."   Silver's activity consisted
entirely of steering legal business.

43.    The Committee also made the scheduled increases in legislative pay in 2020 and 2021
contingent on the legislature enacting a timely budget.   Unlike the limitations and ban on
"outside income," this contingency was specifically authorized in Part HHH § 2(4)(b).

44.    The Committee's report said it considered the salaries of New York City Council
members, which are $148,500.   The Legislature has 90 members who reside in New York City.
These State legislators are all paid less than their City counterparts.

45.    The Committee said it applied the Congressional model.  That is incorrect.  According to
the Congressional Research Service, Congressional base pay is $174,000. Representatives and
Senators may earn "outside income" limited to 15% of the annual rate of basic pay for level II of

the Executive Schedule. Thus, outside income is not tied to members' salary but to a position deemed comparable in the Executive branch. The current limit is $28,050.

46.     Judicial salaries in New York are in the neighborhood of $200,000.

47.     The collective bargaining agreement between the State and the Public Employees Federation contains salaries for civil servants that far exceed the salaries of legislators.

48.     Congress, unlike the New York State Legislature, voted to impose that limit on itself. The limit was not imposed by an unelected Committee, which lacked a clear delegation of authority to do so. The Committee's enabling legislation never referred to "outside income."

49.     Speaker Carl Heastie of the New York State Assembly and former Senate Majority Leader John Flanagan, who negotiated the statute authorizing the Committee on Legislative and Executive Compensation with Governor Andrew Cuomo, both stated publicly that the three of them agreed that the Committee was not authorized to take up the question of outside income. In public statements, the Governor did not contradict that assertion but simply said the end result of the Commission's report was the law now.

50.     The outside income limitation has some very notable characteristics:

    a.  The Committee justified it on the ground of avoiding corruption.

    b.  The Committee's ostensible justification for its actions is called into question by its decision to restrict outside income rules solely to the State Legislature when in fact there has been corruption in the Executive Branch with respect to outside income and conflicts of interest could arise in the Executive Branch as well.

    c.  Physicians are completely exempt from the outside income limitation even though the practice of medicine is heavily regulated in the State of New York, spending on health care is the second largest expenditure in the New York State budget, the

State administers a Medicaid program (and also regulates health insurance) which often creates conflicts with the financial interests of physicians, and the State Assembly has passed a single payer health insurance bill which clearly will impact the interest of physicians.

d.  Plaintiff McDonald is both a pharmacist and a member of the Assembly. Plaintiff McDonald is the owner and operator of an independent pharmacy, Marra's, which has existed in in the City of Cohoes since 1931 and is well-known for providing certain specialized medical services and equipment that "chain" pharmacies do not. His outside income will be restricted under the new rule, whereas physicians are not limited at all.  It is difficult to understand why the outside income limitations would not apply to physicians but would apply to pharmacists, nurse practitioners, and other allied health professionals, such as occupational therapists, for example.  It is difficult to understand why the Committee would disfavor the service in the legislature of owners of independent small businesses.

e.  Retirement income is unrestricted, and not even deducted, from the legislative salary, even if such retirement income is earned from the State of New York or municipal government within the State.  In 2018, plaintiff Steck ran against a retired police officer whom, if he had been elected, would have been able to keep his entire pension, which is likely substantial, plus his legislative salary plus an additional 15% in outside income he received from a variety of other business ventures.

f.  None of the members of the Committee were attorneys and appear quite unfamiliar with what practicing lawyers actually do.  For example, it is difficult to

understand how an exclusively appellate practice, in which arguments are briefed on an existing record, or brief writing, would implicate any of the fiduciary concerns cited by the Committee.

g. Doctors are fiduciaries to their patients in the sense that they also cannot disclose confidential patient information. Both doctors and lawyers are subject to malpractice liability for negligence, but that is not a fiduciary duty. The second largest component of the State budget is Medicaid spending. All doctors have an interest in how much money is allotted for Medicaid spending and how that money is spent. The New York State Legislature also heavily regulates the practice of medicine and public health, while lawyers' conduct is regulated most heavily by the Courts. Conflicts of interest are thus highly likely to arise in the case of physicians who serve as legislators.

h. Investment income is unlimited. A successful personal injury lawyer who banked several million dollars would be able to keep the income from that investment while lawyers who have less lucrative practices would be disadvantaged.

i. Retirement income is unlimited. Retirees may thus both collect retirement income and serve in the legislature, even though, in the case of retirees from public service, the legislature often considers rules relating to retirement from public service.

j. A member who owned thousands of apartments could live off the rental income, whereas a home-builder, and there is one member of the Senate who is in that business, would be disadvantaged.

k.  The Committee effectively established a means test for holding public office. Only those whose current financial obligations could be met purely on a legislative salary could afford to run for the Legislature. Those able to financially afford to serve in the New York State Legislature would be limited to the wealthy, young people for whom the salary is advantageous compared to most young people, single people without dependents, people with wealthy or high earning spouses, and those with the means to live off investments. Persons in the middle of their career with the responsibility of paying college tuition for their dependents (which is a high percentage of New Yorkers) would be disadvantaged. Furthermore, some members come from districts with very high rents or costs of home ownership. Without the benefit of some source of outside wealth, they would be precluded as a practical matter from serving in the Legislature, in the absence of some source of wealth.

51.     For these reasons, the outside income rules of the Committee will reduce the choices of candidates available to the voters.

52.     For these reasons, the diversity of occupations available to contribute to legislative debate will be dramatically reduced.   The practical knowledge and experience that legislators could bring to bear on matters being considered would be severely restricted.  A legislature of professional legislators staffed by former legislative aides who then ran for office would be much more likely.

53.     Plaintiff O'Brien is a citizen of the 110th Assembly District represented by plaintiff Steck.  His choices as a voter would be limited if the outside income limitation/ban favored certain occupations over others in their ability to run for public office.

54.     New York has a judicial pay commission, but the comparison between judges and legislators is inapposite.   The Supreme Court has stated: "Politicians are expected to be appropriately responsive to the preferences of their supporters. Indeed, such 'responsiveness is key to the very concept of self-governance through elected officials.' The same is not true of judges. In deciding cases, a judge is not to follow the preferences of his supporters . . ." *Williams-Yulee v. Fla. Bar*, 135 S. Ct. 1656, 1667 (2015).

55.     The circumstances of lawyers who are also legislators vary.

56.     Plaintiff Steck practices as a member of a law firm.   The "outside income" rules of the Committee reduce the value of plaintiff's partnership interest in his law firm and of his wife, plaintiff Patricia Steck, since she, under New York common law, has a property interest in her husband's partnership in the law firm.   Unlike other professions or businesses, lawyers cannot sell their interest to a non-lawyer, nor is that interest readily transferable to another lawyer because clients seek the unique services of that particular lawyer.   This is particularly true for plaintiff as he is a civil rights attorney, and there are very few of those practicing in the Northern District of New York, where Steck's office is located.   By practicing in a firm, Steck has the support of other lawyers who can handle certain tasks for him while he is working in the legislature.   Nonetheless, Steck's experience in civil rights law has been built up over 30 years in practice in courts all over the State of New York and in other states.   That experience is not transferrable to any member of his law firm.   Furthermore, Steck represents clients in matters outside the State of New York.   He is currently handling a sex discrimination case in the District of Rhode Island against a federal agency.   That work has no conceivable relationship to what he does as a State Legislator in New York, yet is completely banned by the Committee's rules.

57.     On the other hand, plaintiff Abinanti is a solo practitioner. His wife, plaintiff Janet Longo-Abinanti, has a property interest in his law practice under the common law of the State of New York. The rules of the Committee are particularly harmful to solo practitioners. Abinanti's solo practice has included civil litigation, criminal defense, real estate, small business transactions, drafting wills and trusts, probating estates, acting as a guardian *ad litem* and motor-vehicles infraction defense. Since his election in 2010, Abinanti has limited his law practice to accommodate the demands of his public office, to conform to the ethical proscription that lawyers must avoid conflicts of interest, and to comply with the disclosure requirements concerning outside income of legislators. He has limited his law practice to real estate, wills, estates, litigation of election law matters, and an occasional vehicle and traffic defense -- all mostly on behalf of long-time clients. Therefore, Abinanti has shifted his income to a combination of income sources, with his legislative salary being the largest portion and his law income being a small but necessary component. The pay commission mandate prohibiting members of the legislature from practicing law will require Abinanti to close his law practice, which will have severe negative impacts on Abinanti, his family, and his clients, as follows:

   a. First, the pay commission ruling will deprive Abinanti and his wife of a significant asset – a law practice that he has built over 40 years and which has no continued value without his participation. Also the pay commission mandate that will require plaintiff Abinanti to close his law practice would cause adverse negative immediate financial impacts to the entire Abinanti family which includes their 19 year old son who has autism and who attends a Pleasantville High School special needs extended program, is incapable of living on his own, and for now and in the foreseeable future will continue to live with plaintiffs.

b.  Second, the pay commission ruling will adversely affect Abinanti's clients by depriving them of a long-time advisor. Replacing Abinanti or any other lawyer-legislator may cause clients to expend significant funds to familiarize a new attorney with their matters, some now pending and some that may arise in the future requiring knowledge of the client's circumstances in order to handle appropriately. It will also require the lawyer-legislator to transfer files to and brief a new attorney without compensation. Especially in litigation matters, which may take years to complete, the prior experience of counsel built up over time for the benefit of the client, will be lost.

c.  Third, the pay commission ruling could force Abinanti to (1) violate his fiduciary obligation to his clients to maintain files and records and respond to former clients and inquiries regarding previous matters for which he will not be able to be compensated, or alternatively, (2) continue to bear the cost of file maintenance, professional insurance, etc. without compensation to the cover these costs. Plaintiff Abinanti does not have a law firm to perform those functions.

d.  Fourth, the pay commission ruling is vague with no parameters and guidelines. It could be interpreted to prohibit not just the practice of law for remuneration on behalf of "strangers" but even representation of a spouse, child, or other family members or the administration of a family member's estate, the functioning as a court-appointed guardian for a family member, and a wide range of other activities if there is any benefit that could be characterized as income. For example, a member of the Assembly would be prohibited from taking a commission for fulfilling the duties of an executor named in the will of a family

member. None of these activities could in any way be seen as in conflict with performing the duties of a member of the New York State Assembly.

58.     The Pay Committee's rules also act as if being a legislator is like any other government position. It is not. Re-election to the legislature is not guaranteed. Abandonment of a law practice by a legislator who is later not re-elected could prove fatal to his or her ability to resume a law practice in the event the legislator is not returned to office, thus severely compromising the value of the former legislator's law license. Furthermore, professionals must pay fees and satisfy continuing education requirements to maintain licensure to guard against that eventuality. In the case of lawyers, they will have no income other than legislative income to pay the costs of maintaining their professional license. The disincentives for practicing lawyers to serve in the legislature are formidable.

59.     All members of the legislature relied on the New York State Constitution's qualifications for seeking legislative office when they chose to stand for election. The New York State Constitution does not impose a means test for serving in the Legislature. The pay commission arbitrarily, without justification and without legal authority, attempted to redefine the constitutionally defined public office of New York State Assemblymember and Senator by adding requirements not set forth in the New York State Constitution, on which constitutional parameters plaintiffs relied when they first and subsequently sought election.

## COUNT I: VIOLATION OF THE FIRST AMENDMENT

60.     Plaintiffs repeat and reallege each of the allegations in each of the foregoing paragraphs of the complaint.

61.     In *Citizens United v. FEC*, 558 U.S. 310 (2009), the Supreme Court explained that the First Amendment protects not only the right of people to speak but the right of the people to hear.

The Supreme Court protected the right of the people to have a broad pool of candidates available to choose from.[1]   The Supreme Court's First Amendment analysis established the following points:

62.        First, speech may be regulated through disclosure requirements, so that bans or severe restrictions will not upheld.  Less restrictive means are available.  *Id.* at 318.  New York already has a full disclosure statute.  Thus, the Pay Commission's rules are unconstitutionally overbroad in regulating outside income.

63.        Second, it is not permissible to exact a cost on speech after the speech occurs. *Id.* at 336.  Forcing anyone elected to the Legislature to give up outside employment, particularly mid-term without notice, violates this principle.

64.        Third, discrimination against or disfavoring different types of speakers or speakers with particular identities is most difficult to sustain.  *Id.* at 339-341.   Physicians are favored but pharmacists or lawyers are not.  Certain types of income are favored but others are not.

65.        Fourth, the chilling effect on speakers offsets any government interest in preventing *quid pro quo* corruption since there are many other methods for achieving the same end (noting for example that judicial recusal is the appropriate remedy when a litigant played an important role in elevating the judge to the bench, not banning speech in favor of judges).  *Id.* at 359-361.  "Reliance on a 'generic favoritism or influence theory is at odds with standard *First Amendment* analyses because it is unbounded and susceptible to no limiting principle. . . . [D]isclosure is a less restrictive alternative to more comprehensive regulations of speech . . . [T]ransparency

---

[1] *Citizens United* is best known for its finding that corporations have First Amendment rights. But that was merely a threshold issue that needed to be resolved before applying First Amendment analysis.  Whether corporations have First Amendment rights is not an issue in this action.

enables the electorate to make informed decisions and give proper weight to different speakers and messages." *Id.* at 359, 369, 370.

66.        Finally, in its analysis, the Court noted the paucity of states that had chosen to restrict speech in the manner at issue in *Citizens United.* No other State has an outside income ban like New York. *Id.* at 357.

67.        The Court explained the philosophy underlying its ruling as follows (with citations omitted):

> The First Amendment "'has its fullest and most urgent application' to speech uttered during a campaign for political office." ("Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution").
>
> For these reasons, political speech must prevail against laws that would suppress it, whether by design or inadvertence. Laws that burden political speech are "subject to strict scrutiny," which requires the Government to prove that the restriction "furthers a compelling interest and is narrowly tailored to achieve that interest." While it might be maintained that political speech simply cannot be banned or restricted as a categorical matter, the quoted language provides a sufficient framework for protecting the relevant First Amendment interests in this case. We shall employ it here.
>
> Premised on mistrust of governmental power, the First Amendment stands against attempts to disfavor certain subjects or viewpoints. Prohibited, too, are restrictions distinguishing among different speakers, allowing speech by some but not others. As instruments to censor, these categories are interrelated: Speech restrictions based on the identity of the speaker are all too often simply a means to control content.
>
> Quite apart from the purpose or effect of regulating content, moreover, *the Government may commit a constitutional wrong when by law it identifies certain preferred speakers. By taking the right to speak from some and giving it to others, the Government deprives the disadvantaged person or class of the right to use speech to strive to establish worth, standing, and respect for the speaker's voice. The Government may not by these means deprive the public of the right and privilege to determine for itself what speech and speakers are worthy of consideration. The*

*First Amendment protects speech and speaker, and the ideas that flow from each.* [Emphasis added]

The Court has upheld a narrow class of speech restrictions that operate to the disadvantage of certain persons, but these rulings were based on an interest in allowing governmental entities to perform their functions. (protecting the "function of public school education"); (furthering "the legitimate penological objectives of the corrections system"); (ensuring "the capacity of the Government to discharge its [military] responsibilities"; ("[F]ederal service should depend upon meritorious performance rather than political service"). The corporate independent expenditures at issue in this case, however, would not interfere with governmental functions, so these cases are inapposite. *These precedents stand only for the proposition that there are certain governmental functions that cannot operate without some restrictions on particular kinds of speech. By contrast, it is inherent in the nature of the political process that voters must be free to obtain information from diverse sources in order to determine how to cast their votes.* [Emphasis added] .

We find no basis for the proposition that, in the context of political speech, the Government may impose restrictions on certain disfavored speakers. Both history and logic lead us to this conclusion.

68.     The Pay Commission rules violate the First and Fourteenth Amendment because they favor speech by persons with investment income, real estate income, and physicians' income over classes of person with other types of income, such as lawyers, pharmacists, and home-builders. The rules are overbroad because they employ a virtually outright ban against practicing lawyers when New York already has a full disclosure regime and abstention rules in place, a regime that the Supreme Court has deemed adequate to addressing *quid pro quo* corruption concerns. No other state has such a draconian policy. There is no government function that cannot be performed unless outside income is limited. And, the Committee on Legislative and Executive Compensation has deprived the voters, like plaintiff O'Brien, of their right, after full disclosure, to evaluate whether or not they wish to choose to be represented by a person from a particular income-earning occupation.

69.     The Committee does not have the right to self-interpret its enabling legislation in a manner that disposes of the First Amendment interests of candidates or citizens.

70.     Plaintiffs are entitled to a declaration that defendants violated plaintiffs' right of freedom of speech while acting under color of the law of the State of New York.

71.     Accordingly, the Committee's outside income rules are unconstitutional and null and void.

72.     Pursuant to 42 U.S.C. § 1983, defendants DiNapoli, McCall, Stringer, and Thompson are jointly and severally liable to plaintiffs for any damages which plaintiffs may sustain as a result of defendants' action.

73.     Plaintiffs are entitled to the reasonable attorneys' fees, costs, disbursements, and expert witness fees incurred in the prosecution of this action.

74.     Plaintiffs are further entitled to injunctive relief precluding defendant the State of New York from enforcing the Committee's outside income rules, because such rules are not limited in their import to the individual case of the plaintiffs but apply universally to all members of the Legislature and apply on an ongoing basis in perpetuity.

## COUNT II: VIOLATION OF PLAINTIFFS' RIGHT TO EQUAL PROTECTION OF THE LAW

75.     Plaintiffs repeat and reallege each of the allegations in each of the foregoing paragraphs of the complaint.

76.     In its outside income rules, the Committee classified different occupations and different forms of income.

77.     For example, physicians can earn unlimited outside income while serving in the Legislature whereas a pharmacist like plaintiff McDonald is limited to 15% of his legislative salary.

78.     When First Amendment interests are implicated, the classifications must be reasonably necessary to achieve a compelling government objective.

79.     Defendants cannot demonstrate a compelling government objective because they did not apply the restrictions to the executive branch where the government objective, if sincerely held, would be just as compelling.

80.     Defendants cannot demonstrate a compelling government objective since they have relied on a "generic favoritism and influence theory."

81.     Defendants cannot demonstrate a compelling government objective in entirely exempting physicians or retirees from the "outside income" rules.

82.     Even if defendants could demonstrate a compelling state interest, their rules are not reasonably tailored to fit that compelling objective since the objective could be achieved through full disclosure laws already in place.

83.     Citation to the case of Sheldon Silver is inapposite as it occurred prior to implementation of the full disclosure rules and because Sheldon Silver was Speaker of the Assembly.  It is not logical to charge all members of the Assembly with knowledge of what Silver was doing, as it was by its very nature clandestine, Silver was steering legal business not representing clients, and further what Silver did would provide evidence for a compelling state interest only insofar as the position of Speaker of the Assembly or Majority Leader of the Senate is concerned.

84.     The Committee lacked legislative authority in its enabling legislation to classify different occupations and forms of income.  It aggrandized this power to itself, and should not be allowed to do so in derogation of plaintiffs' right to equal protection of the laws.

85.     Plaintiffs are entitled to a declaration that defendants violated plaintiffs' right to equal protection of the laws while acting under color of the law of the State of New York.

86.     Plaintiffs are entitled to relief as against all defendants as aforesaid.

## COUNT III: PLACING UNCONSTITUTIONAL CONDITIONS ON THE RECEIPT OF GOVERNMENT BENEFITS

87.     Plaintiffs repeat and reallege each of the allegations in each of the foregoing paragraphs of the complaint.

88.     Plaintiff legislators' salary, other compensation, and office as members of the New York State Assembly are benefits conferred on them by the New York State Government and by the People of the State of New York.

89.     Article III, § 6 of the New York State Constitution provides that their compensation cannot be reduced in the middle of their term of office.

90.     By virtue of Article III, § 6, plaintiffs have a property interest in their legislative salary.

91.     Plaintiffs Steck and Abinanti have liberty interests in the meaningful use of their law licenses, and plaintiff McDonald is in the same position with respect to his pharmacy license.

92.     Plaintiff Steck has a property interest in the law firm Cooper Erving & Savage LLP, of which he is a member and partner, and as an attorney who derives an income from his practice of law. The same is true of plaintiff Abinanti, a solo practitioner.  The same is true of plaintiff McDonald with respect to his pharmacy.

93.     Under New York common law, plaintiffs' respective wives also have a property interest in each attorney plaintiff's meaningful use of his law license, in the value of plaintiff Steck's partnership in Cooper Erving & Savage LLP, and in the value of plaintiff Abinanti's solo practice.

94.     The Committee's decision to tie legislative pay increases to passage of an on-time budget also violates the First Amendment rights of plaintiffs and their constituents.  Plaintiffs may be forced to choose between the income necessary to avoid default on their family financial obligations and whether to vote for a budget that harms their constituents, or which they may oppose for a wide variety of reasons.

95.     By enacting and/or by enforcing the above referenced outside income limitations on plaintiffs as a condition their continuing to hold legislative office and receive the salary afforded thereto, by tying pay increases to an on-time budget, and by providing that legislators are not paid unless an on-time budget is passed, the State of New York has coercively conditioned each plaintiff's receipt of these benefits on either forgoing his First Amendment right to speak as a citizen and to have others hear his voice or forgoing his constitutionally protected property interests in his law practice, legal partnership, pharmacy license and business, and his ability to meet his and his family's financial obligations which predated the Committee's outside income rules.

96.     It is unconstitutional and in violation of plaintiffs' rights under the First, Fifth, and Fourteenth Amendments for New York State to coerce plaintiffs and their spouses into giving up their enumerated right in their personal property by the threat of withholding the benefit of plaintiffs' public office and salary as a member of the New York State Assembly or to deprive

26

plaintiffs of the power of speech as an elected in the event plaintiffs wish to retain their personal property.

97.      As a citizen, plaintiff O'Brien, and others in his position, are harmed because the withholding of pay creates an incentive for legislators to vote for a budget which includes items which he and his fellow citizens oppose.

98.      Plaintiffs are entitled to a declaration that defendants violated plaintiff's rights under the First, Fifth, and Fourteenth Amendments to the United States Constitution while acting under color of the law of the State of New York.

99.      Plaintiffs are entitled to relief as against all defendants as aforesaid.

## COUNT IV: VIOLATION OF PLAINTIFF'S RIGHT NOT TO HAVE PROPERTY TAKEN WITHOUT DUE PROCESS OF LAW

100.    Plaintiffs repeats and reallege each of the allegations in each of the foregoing paragraphs of the complaint.

101.    Plaintiffs Steck, Abinanti, and McDonald were elected for a two-year term to the New York State Assembly.  When plaintiffs sought that office, they had no notice that there would be restrictions on outside income or that such restrictions would take effect at the beginning of the second year of the two-year term.

102.    While a term of office is held in the public trust, and plaintiffs do not have a property interest in such term in the absence of any state law principle creating such a property interest, Article III § 6 creates such a property interest in providing that a legislator's compensation may not be reduced during his term of office.  It is well-established that such a property interest may not be reduced mid-term, unless the person affected has engaged in some sort of misconduct,

which would establish reasonable grounds to do so, based on some existing statute authorizing such a remedy. No such statute is applicable here.

103.   Defendants, while acting under color of State law, altered the terms and conditions for service as a Member of the Assembly mid-term by suddenly and unexpectedly reducing plaintiff's ability to earn "outside income," based on generic findings not applicable to the individual plaintiffs, thus violating plaintiffs' right not to have his property taken without due process of law in violation of the due process clause of the Fourteenth Amendment.

104.   If any of the legislator plaintiffs choose to remain in public employment, his property interest in his respective law license/practices or pharmacy license/business has been taken in whole or in part; if he chooses to leave public employment, his property interest in not having his compensation reduced during his term of office has been taken. In either case, the due process clause of the Fourteenth Amendment has been violated.

105.   Plaintiffs are entitled to a declaration that defendants violated plaintiffs' right to due process of the law while acting under color of the law of the State of New York.

106.   Plaintiffs are entitled to relief as aforesaid.

## COUNT V: VIOLATION OF THE CONSTITUTIONAL PROHIBITION ON THE IMPAIRMENT OF CONTRACTS

107.   Plaintiffs repeat and reallege each of the allegations in each of the foregoing paragraphs of the complaint.

108.   Article I, section 10, clause 1 of the United States Constitution prohibits a State from passing any law that "impairs the obligation of contracts."

109.    For example, once a private party has entered into a contract with the State of New York, and the private party has agreed to the terms of that contract, the State cannot use its legislative or executive power to change the terms of that contract.

110.    When plaintiffs were elected to serve a two-year term in the New York State Assembly, the terms of their contracts vested under Article III, § 6 of the New York State Constitution, such terms included the ability to earn outside income without reduction during their term.

111.    By altering the terms of plaintiffs' contract mid-term, and eliminating plaintiffs' ability to earn outside income, defendants while acting under color of State law, violated the constitutional provision concerning the obligation of contracts.

112.    Plaintiffs are entitled to relief as aforesaid.

## COUNT VI: UNLAWFULL RULE-MAKING IN VIOLATION OF PLAINTIFF'S RIGHT NOT TO HAVE PROPERTY TAKEN WITHOUT DUE PROCESS OF LAW

113.    Plaintiffs repeat and reallege each of the allegations in each of the foregoing paragraphs of the complaint.

114.    The Committee on Legislative and Executive Compensation failed to provide adequate notice that it was adopting rules limiting outside income, nor what those specific rules might be.

115.    The Committee did not simply engage in generic legislative rulemaking by enacting bans on outside income that would affect future members of the legislature.

116.    Rather, the Committee purported to enact such bans mid-term, thus personally affecting a narrow class of current members of the legislature that are readily identifiable, especially attorneys-at-law who were singled out for a complete ban on outside income during the last year of their term.

29

117.    By failing to give current members of the legislature notice of the proposed rulemaking and an opportunity to be heard as to the impact of such rules on them individually, the Committee violated plaintiffs' right to due process of law under the Fourteenth Amendment to the United States Constitution.

118.    Plaintiffs are entitled to relief as aforesaid.

## COUNT VII: LEGISLATING UNCONSTITUTIONALLY IN CONTRAVENTION OF THE CLAUSE GUARANTEEING THE STATES A REPUBLICAN FORM OF GOVERNMENT

119.    Plaintiffs repeat and reallege each of the allegations in each of the foregoing paragraphs of the complaint.

120.    Article IV, section 4, guarantees each state a republican form of government.

121.    The heart of such clause is to have the laws of every state made by an elected, representational state legislature.   Such principle would not permit amendments to the constitution of a State other than through an elected, representational process.

122.    Under Article IV, section 4, a legislature cannot delegate to any unelected nonrepresentational body the right to pass laws that supersede existing laws or which change the constitution of a state.  The legislature may, consistent with the republican form of government, delegate to a commission that may have very specialized technical expertise in a particular field the authority to use that technical expertise to fill in a provision of a statute that enacts a particular specialized technical requirement or benefit.  The delegated inquiry of the commission must be extremely focused, detailed, and limited in its mission. In the instant matter, the legislature did authorize a commission composed of current and former comptrollers to use their expertise to set the government salary of legislators and certain executive branch employees and the legislature specified the criteria to be used in determining that salary.  A State legislature,

30

however, cannot delegate lawmaking in an area where such technical expertise is not required and where the decision is to make a choice in public debate between different policy alternatives.

123.    The Pay Committee, an unelected, nonrepresentational body, was not given the authority to write a statute banning "outside income" but aggrandized power to itself and nevertheless did so.

124.    The Pay Committee engaged in lawmaking that changed the qualifications of the members of the Legislature, which are set forth in Articles III and XIX of the New York State constitution, thus usurping the processes for amending the constitution of New York State which include passage of such amendment by two consecutive legislatures and ratification by the voters.

125.    Even if the Committee believed it could imply such authority for itself from its enabling legislation, which did not give it that power, such implied power is unconstitutional, as the authority to make statutes may only be exercised by an elected representational body, which the Commission was not.

126.    The Committee consisted only of males appointed from a limited background from a very narrow part of the geography of New York State.

127.    When an unelected Committee makes laws, as this Committee did with respect to "outside income," it has contravened the requirement of a republican form of government and invaded the province of the elected representatives of the people allocated to them in a government founded on the separation of powers.

128.    The Committee report did not purport to justify its ruling on outside income with reference to any particularized technical expertise, thus proving that the Committee was acting outside constitutional requirements.

129.   The Committee unabashedly aggrandized to itself the ability to make laws in violation of the requirement of a republican form of government.

WHEREFORE, plaintiffs demand judgment against defendants as follows:

A.   Declaring, adjudging, and decreeing that defendants have violated plaintiffs' constitutional rights under Article I, section 10, clause 1, Article IV, section 4, and the First, Fifth, and Fourteenth Amendments to the United States Constitution Clause in the manner described in this complaint.

B.   Declaring, adjudging, and decreeing that the "outside income" rules of the Committee on Legislative and Executive Compensation are unconstitutional and void.

C.   Declaring, adjudging, and decreeing that legislative pay or pay increases may not be conditioned on passage of an on-time budget and declaring that any such law or rule of the Committee on Legislative and Executive Compensation is unconstitutional and void.

D.   For damages against the individual defendants to the extent permitted under 42 U.S.C. § 1983 and upon appropriate proof that plaintiff has sustained such damages.

E.   For injunctive relief against the State of New York barring it from enforcing the "outside income" rules of the Committee on Legislative and Executive Compensation on the ground that the unconstitutional rules in question are not limited in application to the individual plaintiffs but apply on an ongoing basis to numerous others in addition to plaintiffs and will be recurring *ad infinitum* unless and until enjoined.

F.   For injunctive relief against the State of New York barring it from conditioning current or future legislative pay on whether or not an on-time budget is passed on the ground that the unconstitutional rules in question are not limited in application to the individual

plaintiffs but apply on an ongoing basis to numerous others in addition to plaintiffs and will be recurring *ad infinitum* unless and until enjoined.

G.    For the attorneys' fees, expert witness fees, and costs and disbursements incurred in the prosecution of this action.

H.    For such other and further relief as this Court deems just and proper.

DATED:    Albany, New York
          May 29, 2019

                            COOPER ERVING & SAVAGE LLP
                            Attorneys for plaintiffs
                            39 North Pearl Street
                            Albany, New York 12207
                            (518) 449-3900

                            By: _____
                                Phillip G. Steck
                                Bar Roll #PS5318

                            THOMAS J. ABINANTI, ESQ.
                            Co-counsel for plaintiffs
                            291 Bear Ridge Road
                            Pleasantville, NY 10570
                            (914) 328-9000
                            Bar Roll # TA6533